UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

EDGEWOOD MANOR APARTMENT HOMES LLC,
SOUTHLAND MANAGEMENT CORPORATION,

        Plaintiffs,

        v.                          Case No. 08-C-0920

RSUI INDEMNITY COMPANY,

        Defendant.

DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT (DOC. # 11), GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. # 38), AND SETTING
SCHEDULING CONFERENCE

        Plaintiffs, Edgewood Manor Apartment Homes LLC (Edgewood Manor) and

Southland Management Corporation (Southland), filed this lawsuit against defendant, RSUI

Indemnity Company, asserting that (1) RSUI has denied its obligation to reimburse it for

repairs, replacement and code upgrades under Southland's insurance policy and should

be directed to pay over $1.5 million, and (2) RSUI's refusal to pay was in bad faith,

justifying compensatory and punitive damages, along with attorneys' fees.

        Earlier, the court denied RSUI's motion to dismiss, finding that Georgia law

governed the statute of limitations for plaintiffs' contract claim rather than Mississippi law,

because the significant event giving rise to that claim occurred in Georgia.  Since that

decision, the parties have not filed any additional motion addressing the Georgia statute

of limitations period.  Therefore, the court turns to the merits of the claims addressed by

the pending motions for summary judgment.

        As discussed in this court's order of June 14, 2010, diversity jurisdiction exists

inasmuch as more than $75,000 is at issue and the parties are diverse.  The members and

partners of the entities behind Edgewood Manor are citizens of New York, New Jersey, Delaware, Illinois, Virginia, and California. Also, according to the Complaint, plaintiff Southland is a citizen of Mississippi. The Answer confirmed that defendant RSUI Indemnity Company is a citizen of New Hampshire and Georgia.

Plaintiffs seek summary judgment on their contract claim and summary judgment on liability regarding their bad faith claim. RSUI's cross-motion for summary judgment, seeks dismissal of the case.[1] The court's review of the parties' briefs raised questions regarding plaintiffs' standing, and a letter from plaintiffs regarding repair and replacement of the property suggested that the posture of the case might have changed. As a result, on June 24, 2010, the court held a status conference and oral argument hearing regarding the summary judgment motions. Following the hearing, the parties were permitted to file supplemental materials, which the court has now considered.

SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the depositions, documents, affidavits or declarations, stipulations, and admissions, show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of demonstrating it is entitled to summary judgment. *Celotex Corp.*, 477 U.S. at 323. Once this burden is met, the nonmoving party must designate facts to support or defend each element of its cause of action, showing that there is a genuine issue for trial.

---

[1]Plaintiffs object to defendant's initial brief as exceeding the thirty-page limit. (*See* Civil L.R. 7.1(f) (2003).) However, the thirty-page limit is exclusive of facts. *Id.* When pages containing RSUI's statement of facts are subtracted, RSUI's brief is within the limit.

*Id.* at 322-24. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The mere existence of a factual dispute does not defeat a summary judgment motion; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. To establish that a question of fact is "genuine," the nonmoving party must present specific and sufficient evidence that, if believed by a jury, would support a verdict in its favor. *Anderson*, 477 U.S. at 249; *see* Fed. R. Civ. P. 56(e).

Because the parties in this case filed cross-motions for summary judgment, many facts are not contested. When no genuine issue of material fact exists, the sole question is whether the moving party is entitled to judgment as a matter of law. *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996). Nevertheless, when both parties have moved for summary judgment, both are required to show that no genuine issues of material fact exist, with the facts taken in the light most favorable to the party opposing each motion. Neither party is entitled to summary judgment if genuine issues of material fact exist. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983). The proper procedure is to assess the merits of each summary judgment motion independently. See *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). That one party fails to satisfy its burden of establishing that no

genuine issue of material fact exists respecting its motion and that it is entitled to a judgment as a matter of law does not automatically indicate that the opposing party has satisfied its burden and must be granted summary judgment on the other motion. *See* 10A Charles Alan Wright et al., Federal Practice & Procedure § 2720 (3d ed. 1998).

UNDISPUTED FACTS

RSUI issued Policy No. NHD 338373 to Southland for the period effective from December 1, 2004 to December 1, 2005 (the "RSUI Policy"). (Pls.' Stmt. of Undisputed Material Facts ("PSUMF") ¶ 1; Def.'s Stmt. of Undisputed Material Facts ("DSUMF") ¶ 1.[2]) Pursuant to the terms of the RSUI Policy, RSUI agreed to provide Commercial Property Coverage for a building located at 3318 39th Avenue, Gulfport, Mississippi (the "Property"), and other properties. (PSUMF ¶ 2; Def.'s Resp. to Pls.' Stmt. of Undisputed Material Facts ("Def.'s Resp.") ¶ 3; DSUMF ¶ 4.) The RSUI Policy provides for excess insurance over and above coverage afforded under a primary insurance policy issued by Westchester Surplus Lines Insurance Company, policy number D35928716 002 (the "Westchester Policy"). (DSUMF ¶¶ 2, 3; PSUMF ¶ 4.)

In accordance with the Excess Physical Damage Coverage Form, RSUI agreed, subject to the limitations, terms, and conditions in the RSUI Policy,

> to indemnify the Insured named in the schedule herein in respect of direct physical loss or damage to the property described in the schedule . . . occurring during the period stated in the schedule and caused by any of such perils as are set forth in Item three of the schedule, and which are also covered by and defined in the policy(ies) specified in the schedule and issued by the "Primary Insurer(s)" stated therein.

---

[2]Unless noted otherwise, a proposed finding of fact was unopposed or, if opposed, altered to reflect the opposing party's changes.

(PSUMF ¶ 5; Def.'s Resp. ¶ 5; DSUMF ¶ 5.)  In addition, the RSUI Policy provides that "[i]n respect of the perils hereby insured against, this Policy is subject to the same warranties, terms and conditions . . . as are contained in or as may be added to the policy(ies) of the primary insurer(s) prior to the happening of a loss for which claim is made hereunder." (Def.'s Resp. ¶ 5; DSUMF ¶ 5.)

The RSUI Policy contains a provision on "Transfer Of Your Rights And Duties Under This Policy," which states:  "Your rights and duties under this policy may not be transferred without our written consent except in the case of death of an individual named insured." (Def.'s Resp. ¶ 5; DSUMF ¶ 5; West Decl. ¶ 2, Ex. 1 at 14.) (The court will refer to this provision as the "no-transfer" provision.)  The RSUI Policy's terms could be "amended or waived only by endorsement issued by [RSUI] and made a part of this policy." (DSUMF ¶¶ 5, 6.)

According to the Westchester Policy's declarations pages, which the parties do not dispute apply to the RSUI Policy as well, commercial coverage includes coverage options for "agreed value" and "replacement cost." (PSUMF ¶ 6; West. Decl. filed 1/21/09, Ex. 1 at 24.)  The provision regarding replacement costs under the Westchester Policy states that "Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form." (PSUMF ¶ 8; West Decl. filed 1/21/09, Ex. 1 at 47.)

Importantly, the Westchester Policy further states that the insurer "will not pay on a replacement cost basis for any loss or damage:  (1) Until the lost or damaged property is actually repaired or replaced; and (2) Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage." (Def.'s Resp. ¶ 8; DSUMF ¶ 7;

5

West Decl. filed 1/21/09, Ex. 1 at 48 (¶ G.3.d.).)  (The court will refer to this as the "replacement cost requirement.")  Replacement cost reimbursement for tenants' improvements will not be paid "if others pay for repairs or replacement."  (West Decl. filed 1/21/09, Ex. 1 at 48 (¶ G.3.d.(4)), at 45 (¶ E.7.e.).)  (The court will refer to this as the "tenants' improvements" provisions.)  Further, the insurer will not pay replacement costs greater than the limit of insurance applicable to the particular property, the cost to replace the lost property with property of comparable material and quality and used for the same purpose, or the amount actually spent on repair and replacement, whichever is lowest.  (*Id.* at 48 (¶ G.3.e.).)

Commercial coverage under the Westchester Policy includes an additional $500,000 for "Ordinance or Law Coverage" for all buildings and premises.  (PSUMF ¶ 7; DSUMF ¶¶ 10-12.)  The Westchester Policy contains an Increased Cost of Construction provision and Ordinance or Law Coverage endorsement, which protect against increased costs of construction due to code compliance and ordinances or laws in place at the time of loss regulating the demolition, construction or repair of buildings or establishing zoning or land use requirements.  (Def.'s Resp. ¶ 7; *see* DSUMF ¶¶ 7, 9.)  This increased cost of construction coverage (the court will refer to it as "code upgrade" coverage) applies to buildings for which the replacement cost optional coverage provides protection.  (DSUMF ¶ 7.)  However, under the Westchester Policy the insurer

> will not pay for the increased cost of construction:
>
> (a)  Until the property is actually repaired or replaced, at the same or another premises; and
>
> (b)  Unless the repairs or replacement are made as soon as reasonably possible after the loss or damage, not to

6

> exceed two years.  We may extend this period in writing
> during the two years.

(Def.'s Resp. ¶ 7; DSUMF ¶¶ 7, 9; West Decl. filed 1/21/09, Ex. 1 at 73, 39.)

On August 29, 2005, the Property sustained damage from Hurricane Katrina. (PSUMF ¶ 9; DSUMF ¶ 13.)  Richard West at Goodman-Gable-Gould, the adjusters for Southland, first notified Joel Steber at Engle Martin & Associates, Inc., the adjusters for RSUI, around December 15, 2006, that Southland intended to rebuild the Property and that it would submit a claim for repair or replacement proceeds, as well as code upgrade proceeds.  (PSUMF ¶ 10; DSUMF ¶ 13.)  Steber is an independent claim adjuster who provided services for RSUI regarding the loss and claim made by Southland because of the damages to the Property on August 29, 2005.  (DSUMF ¶ 14.)

Based on the claim adjusting process, Westchester paid Southland its $2,500,000 policy limit under the Westchester Policy.  (DSUMF ¶ 15.)  RSUI paid Southland $3,532,795.36—the full actual cash value of damage to the Property in excess of the payments by Westchester.  (DSUMF ¶ 15.)

On or about December 18, 2007, West notified Steber in a telephone conversation that Southland intended to sell the Property and either assign the post-loss claim benefits or transfer the RSUI Policy to the purchaser.  (West Decl. filed 1/21/09 ¶ 9; Steber Aff. ¶ 9; *see* DSUMF ¶ 16.)  Steber responded that he thought assignment of any post-loss claim would be excluded under the no-transfer provision.  (West. Decl. ¶ 10.[3])

On or about January 2, 2008, West wrote to Steber, stating:

---

[3]RSUI objects to this proposed finding as hearsay (in his declaration West is stating what Steber said).  As RSUI's agent, Steber probably is considered a party-opponent whose statements are admissions.  However, the dispute regarding admissibility in the end is immaterial as discussed below.

> During our telephone conversation on December 18th, 2007 you were notified that the insured intends to sell the property and assign the post loss claim benefits for the recoverable depreciation to the purchaser. You stated that you thought this was excluded in the policy and referenced the policy "F. Transfer Of Your Rights And Duties Under This Policy". The insured is not intending to transfer the rights and duties of the policy, only assign the benefits of a mature claim. We request that you confer with RSUI in order to clarify their position regarding this issue. In addition, I am enclosing case law regarding the assignment of insurance benefits, which I am sure RSUI is familiar with. Please contact me with any questions that you may have.

(PSUMF ¶¶ 13, 14; West Decl. filed 1/21/09, Ex. 2 at 1.) Accordingly, West submitted case law from Florida, West Virginia, Tennessee, and the Southern District of New York. (PSUMF ¶ 15; Def.'s Resp. ¶ 15; West Decl. Ex. 2.)

On or about March 12, 2008, Steber responded on behalf of RSUI. (West Decl. Ex. 3.) He quoted the no-transfer provision and the Westchester Policy Replacement Cost Provision, paragraph G.3.d. of the Building and Personal Property Coverage Form, and part of one of the tenants' improvements provisions. Steber then stated:

> RSUI Indemnity Company has authorized us to convey to you their position that to the extent that Southland Management sells the subject property and attempts to assign their rights under the policy to a potential purchaser, the purchaser can only obtain only [sic] those rights which Southland would have had if there had been no sale/assignment. Applied to this claim, if Southland has not repaired or replaced the subject property as of the time of the sale, it is not entitled to recover repair or replacement costs, thus, Southland cannot pass, transfer or assign any rights to the purchaser including, but limited [sic] to repair costs, replacement costs, code upgrade costs or additional claims to any potential purchaser. As such, if Southland Management sells the subject property prior to incurring any repair/replacement/code upgrade costs, any prospective purchaser will similarly be prohibited from collecting any repair/replacement/code upgrade costs.

The Company expressly reserves all of its rights under the terms and conditions of the policy or pursuant to applicable law, whether or not mentioned herein. The failure to raise other terms and conditions of the policy at this time should not be deemed a waiver of RSUI Indemnity Company's right to do so in the future should circumstances warrant. All rights remain reserved.

(PSUMF ¶ 17; Def.'s Resp. ¶ 17; West Decl. filed 1/21/09, Ex. 3 at 2-3.)

On July 9, 2008, Attorney Jeffrey Evans, on behalf of "Gorman & Company" and referencing Southland's Hurricane Katrina matter, wrote:

We believe that the positions taken by RSUI as outlined in your letter of March 12, 2008 are not well-taken and, accordingly, we request that RSUI acknowledge its obligation to pay for replacement costs as provided in its policy or provide a thorough explanation for its refusal to do so.

. . . . Pursuant to its policy issued to Southland Property Management Corp., RSUI is obligated to pay an amount of approximately $1,045,000 representing the balance of the Replacement Cost coverage proceeds, subject to the condition that the property is repaired. . . .

We also note that RSUI is obligated to pay an additional amount up to the "Increased Cost of Construction Coverage." [sic] limits of $500,000. It is our understanding that RSUI does not dispute its obligation with respect to the Increased Cost of Construction Coverage. We request that you advise us if our understanding is inaccurate or incomplete.

Pursuant to an agreement in June 2007, as subsequently amended, Edgewood Manor Associates, LP sold the Property to Edgewood Manor Apartment Homes, LLC ("Edgewood Manor"). The agreement further provides that Edgewood Manor is the attorney-in-fact with respect to recovery of the Replacement Cost Proceeds. . . .

Southland's right to designate a payee for the Replacement Cost Proceeds is well within established Mississippi authority. See, e.g., *Great Southern Nat. Bank v. McCullough Environmental Services, Inc.*, 595 So.2d 1282 (Miss. 1992). Moreover, Mississippi law is clear that an

assignment of proceeds due under a contract is valid **even if the contract expressly prohibits assignment.** See, e.g., *Ayers v. State Farm Fire & Cas. Co.*, 2007 WL 1378401 (S.D. Miss. 2007); *Merchants & Farmers Bank of Meridian v. McClendon*, 220 So.2d 815 (Miss. 1969).

. . . . The only remaining condition for payment of the balance of the Replacement Cost Proceeds is that the property be repaired, and that process is currently underway.

However, in your March 12, 2008 [letter], you indicated that RSUI's position is that any assignment of the Insurance Proceeds is precluded by Common Policy Conditions Paragraph F. In fact, and in accordance with *Merchants & Farmers Bank of Meridian v. McClendon*, the purported assignment restriction contained in Paragraph F is not valid.

You also stated that if Southland had not completed repairs by the time of the sale, it would no longer be entitled to the balance of the Replacement Cost Proceeds. . . .

. . . . [W]e hereby request that RSUI affirm that it will comply with the terms of the policy by issuing a check representing the balance of the Replacement Cost Proceeds upon completion of repairs to the Property, as well as the Increased Cost of Construction Coverage limits for a total potential payment of approximately $1,546,000. In the alternative, we hereby request that RSUI provide us with a thorough explanation of why it believes that it has been relived [sic] of its obligations . . . .

(Evans Aff. filed 1/21/09 Ex. 4 at 1-3 (citation omitted).) In this letter, Evans asserted that RSUI's reliance on the tenants' improvements provision was misplaced because repair work was being done on the Property. (*Id.* at 2.)

On or about July 29, 2008, counsel for RSUI, Courtney Murphy, responded to Evans's letter of July 9, 2008. (DSUMF ¶ 27.) Murphy stated RSUI's position that "Gorman & Co. can only obtain those rights which Southland Management would have had

if there had been no assignment. Once conveyed, the assignor no longer has interest therein." (Evans Aff. filed 1/21/09 Ex. 5 at 1.) She continued:

> Because Southland Management failed to repair or replace the property, Southland was not entitled to recover repair or replacement costs under the policy. Thus, Southland could not pass, transfer or assign any greater rights or interest than it possessed at the time. Southland's future rights are extinguished by the conveyance to Gorman, and repair/replacement value is a greater right than that possessed by Southland at the time of conveyance.
>
> While we further acknowledge the citations of your letter, we note that nothing contained in those cases stand for the proposition that a future right of a contracting party, requiring the performance of a condition precedent by the contracting party before proceeds become due, may be assigned to a non-contracting party, or conversely, that the prohibition of such variable future right cannot be prohibited by contract.
>
> For these and other good reasons, your requests are denied. In doing so, the Company expressly reserves all of its rights under the terms and conditions of the policy or pursuant to applicable law, whether or not mentioned herein. The failure to raise other terms and conditions of the policy at this time should not be deemed a waiver of RSUI Indemnity Company's right to do so in the future should circumstances warrant. All rights remain reserved.

(Evans Aff. filed 1/21/09 Ex. 5 at 1-2.)

Murphy and Evans engaged in further discussions by telephone and e-mail and spoke on or about August 5, 2008. (DSUMF ¶ 28.) Around August 18, 2008, Evans sent Murphy e-mail correspondence that included his e-mail from August 5, 2008, which had been addressed incorrectly. (DSUMF ¶¶ 29-32.) The August 5 e-mail referenced a case Evans contended supported his client's position. (DSUMF ¶ 34.)

Murphy acknowledged receipt of the August 18 e-mail the following day. (DSUMF ¶ 35.) She received another e-mail from Evans on August 28, 2008, requesting further explanation and case law supporting RSUI's position. (DSUMF ¶ 36.) Murphy e-mailed Evans on September 9, 2008, discussing case law and promising "[m]ore to follow." (DSUMF ¶ 37; Pls.' Resp. ¶ 37; Murphy Aff., Ex. 4.) RSUI maintained its position in the September 3 e-mail exchanges between Murphy and Evans contending that the assignment of Southland's unaccrued rights was improper and that the new property owners would not be entitled to replacement cost or ordinance or law proceeds whereas Evans asked that Murphy urge RSUI to "look again" at case law he had provided to RSUI previously. (DSUMF ¶ 40.)

RSUI did not give Southland written consent that Southland's rights and/or duties under the Policy or the Westchester Policy may be transferred. (DSUMF ¶ 18.) Nor did it extend in writing the period for code upgrade proceeds under the RSUI Policy or Westchester Policy. (DSUMF ¶ 20.) Also, Southland at no time represented that an individual named insured is deceased. (DSUMF ¶ 19.)

In addition, Steber was never provided a contract or agreement showing a sale of the Property or assignment of insurance policy rights. (DSUMF ¶¶ 21, 22; Pls.' Resp. to Stmt. of Material Facts ("Pls.' Resp.") ¶¶ 21, 22.) And, RSUI has not paid Southland the replacement cost or ordinance or law coverage claims. (DSUMF ¶ 24; Pls.' Resp. ¶ 24.) On February 12, 2008, Southland, as managing general partner of the owner of the Property, transferred the Property to Edgewood Manor by warranty deed. (Matkom Aff. Ex. A.) In accordance with the terms of the sale, Edgewood Manor has an interest in

the proceeds that are the subject of this litigation.  (Matkom Aff. ¶ 13.)  As of February 20, 2009, the Property had not been repaired or replaced.  (DSUMF ¶ 25.)

CHOICE OF LAW

Under the *Erie* doctrine, a federal court exercising diversity jurisdiction must follow the law of the state in which the action is brought.  *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).  Therefore, this court applies Wisconsin choice of law principles to determine which state's substantive law applies.  *See Sybron Transition Corp. v. Sec. Ins. Co.*, 107 F.3d 1250, 1255 (7th Cir. 1997).  Here, both parties agree that Mississippi substantive law applies, and this court concurs with them.

In contract cases, Wisconsin choice of law principles point toward the law of the state with which the contract has the most significant relationship, also known as the "grouping-of-contacts approach."  *Jafari v. Wynn Las Vegas, LLC*, 569 F.3d 644, 649 (7th Cir. 2009); *Sybron Transition Corp.*, 107 F.3d at 1255.  The law of the forum presumptively applies unless it is clear that nonforum contacts are of greater significance.  *Jafari*, 569 F.3d at 649.  The relevant contacts include:  (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domiciles, places of incorporation and places of business of the parties.  *Id.*  Quantity is not decisive; instead, the court must determine which contacts are most significant and where those significant contacts are found.  *Sybron Transition Corp.*, 107 F.3d at 1255.

Plaintiffs seek recovery of proceeds for damage caused to the insured Property located in Mississippi by or related to Hurricane Katrina on August 29, 2005.

(Compl. ¶¶ 7, 8, 14.)  Southland, a Mississippi corporation with its principal place of business in Mississippi, obtained the insurance policy from RSUI, a New Hampshire corporation with its principal place of business in Georgia.  (Compl. ¶¶ 2, 3, 7.)  At the time of Hurricane Katrina, Southland was the managing general partner of the entity that owned the Property.  (*See, e.g.*, Matkom Aff. Ex. A at 2.)  That owner appears to have been a limited partnership organized under Mississippi law as well.  (DSUMF ¶ 26; Matkom Aff. Ex. A.)  Subsequent to the hurricane, Southland, on behalf of the limited partnership, sold the Property to Edgewood Manor.  (Matkom Aff. Ex. A.)

Mississippi contacts are the most significant to the RSUI Policy.  At the time of the damage, the insurance policy was issued to a Mississippi entity with a principal place of business in Mississippi regarding Mississippi real property that was damaged by a hurricane that hit Mississippi.  Although RSUI may have denied payment and performed its part of any insurance contract in Georgia, Southland also operated in Mississippi.  Contacts with Wisconsin are minimal, as Edgewood Manor, which has ties to this jurisdiction, purchased the Property after the damage occurred, and the Property nevertheless is situated in Mississippi.

In this case, the contacts with Wisconsin are less than those in *Jafari*, in which one contracting party resided in Wisconsin when he entered into the contracts at issue.  *See Jafari*, 569 F.3d at 650.  Thus, Mississippi contacts to the RSUI policy are greater than Georgia and Wisconsin contacts.  Consequently, the court will apply Mississippi law to the RSUI Policy.

Having concluded that Mississippi law applies, this court must apply Mississippi substantive law as enacted by that state's legislature and as interpreted or

14

declared by that state's highest court. *See Home Valu, Inc. v. Pep Boys—Manny, Moe and Jack of Del., Inc.*, 213 F.3d 960, 963 (7th Cir. 2000); *see also Erie*, 304 U.S. at 78-79. However, if the state's highest court has not spoken on the issue and the law is unclear, this court must predict how the state's highest court would decide the questions presented. *Rodman Indus., Inc. v. G & S Mill, Inc.*, 145 F.3d 940, 942 (7th Cir. 1998). Always, the question is how this court believes the state's highest court would rule. *Home Valu, Inc.*, 213 F.3d at 963-64. However, federal courts sitting in diversity should hesitate to expand state law in the absence of any indication of intent by the state courts or legislature. *King v. Damiron Corp.*, 113 F.3d 93, 97 (7th Cir. 1997). Ordinarily, when faced with two equally plausible interpretations of state law, the federal court should choose the interpretation restricting liability, rather than an expansive interpretation which creates substantially more liability. *Home Valu, Inc.*, 213 F.3d at 963.

The present case appears to raise an issue of first impression under Mississippi law.

## DISCUSSION

A.    Standing to Sue

During a hearing on June 24, 2010, this court asked the parties to address Edgewood Manor's standing to sue on the RSUI Policy. Southland said it owned the Property but nothing in the record evidenced a sale or otherwise established that Edgewood Manor held any insurable interest. At that time the record included (1) the letter from West to Steber dated January 2, 2008, stating that Southland "intends to sell the property" (West. Decl. filed 1/21/09, Ex. 2), which in no way established that a sale ever

15

took place, and (2) Evans's letter of July 9, 2008, on behalf of Gorman & Company, representing (with no noted basis for Gorman's knowledge or relation to the transaction) that the prior owner of the Property had sold it to Edgewood Manor and had named Edgewood Manor its "attorney-in-fact" regarding replacement cost proceeds.

These letters failed to establish an insurable interest on the part of Edgewood Manor. The first letter suggested only that Southland might sell the Property to someone, whereas the second failed to establish that Gorman or Evans had personal knowledge of the sale or were involved in the sale of the Property. Indeed, nothing in the record sufficiently showed an assignment from Southland to Edgewood Manor of any rights or proceeds under the RSUI Policy.

At the June 2010 hearing ownership of the Property became even murkier, drawing into question whether Southland ever had an insurable interest in the Property. Counsel for plaintiffs indicated that Southland was merely the Property *manager*, with someone else as owner. Subsequently, plaintiffs cleared up the matter of standing as to Southland. As indicated in their supplemental submission of July 12, 2010, Southland was the managing general partner and a limited partner of Edgewood Manor Associates, L.P. ("Edgewood LP"), the entity that owned the Property at the time of Hurricane Katrina. (*See* Matkom Aff., Ex. H.) As managing general partner and limited partner Southland appears to have had an insurable interest. *See* Jeffrey Jackson, *Mississippi Ins. Law & Practice* § 4:12 (2010) ("A legal or equitable interest in the property is generally (but not always) required in Mississippi."); *id.* § 4:13 (stating that "for property insurance the interest must exist at the time the loss is suffered"). In addition, it appears that RSUI's checks for loss

16

to the property were made payable to Southland, "Edgewood Manor,"[4] Adjusters International, and sometimes FNMA/Capmark, bolstering a finding that Southland had an insurable interest. (Matkom Aff. ¶¶ 6-9, Exs. B-E.)

Although the evidence respecting Edgewood Manor's insurable interest is thin, it exists nonetheless. The July 12, 2010, affidavit of Edward Matkom, General Counsel of Gorman & Company, Inc., establishes that Gorman is the managing member of plaintiff Edgewood Manor. Attached to Matkom's affidavit is a copy of the warranty deed conveying the Property from Edgewood LP to plaintiff Edgewood Manor, dated February 12, 2008, indicating that plaintiff Edgewood Manor now owns the Property. (Matkom Aff. ¶ 5, Ex. A.)

RSUI points to the absence in the record of a sale agreement or other document evidencing an assignment of RSUI Policy rights or proceeds to Edgewood Manor. While such documents would have been better evidence of Edgewood Manor's interest in the Property, Matkom avers that "in accordance with the terms of the sale of the Property Edgewood LLC [plaintiff Edgewood Manor] has an interest in the proceeds that are the subject of this litigation." (Matkom Aff. ¶ 13.) Matkom submits that he has personal knowledge and that Gorman has possession of Edgewood Manor's business records; no evidence suggests the contrary. Hence, the court finds that the statement is correct, especially in regard to RSUI's motion for summary judgment.

If a valid assignment occurs, the original policyholder is no longer a proper party plaintiff; instead, the assignee stands in the insured's shoes, taking the assignment

_____

[4]The "Edgewood Manor" named on the check was Edgewood LP, not the plaintiff here.

17

subject to any and all defenses the insurer could have asserted against the insured. *Wilson v. State Farm Fire & Cas. Co.*, 95-CA-00552-COA (¶ 10), 761 So. 2d 913, 917 (Miss. Ct. App. 2000). Although the evidence now shows that Edgewood Manor has an "interest in the proceeds" at issue, it remains unclear whether a full assignment was made, extinguishing Southland's interest, or whether a partial assignment or other sharing of interests occurred. In sum, although Southland and Edgewood Manor have shown enough at this stage for the purpose of standing, they will have to do better at trial to sort out their respective "interests."

B.      Coverage under the RSUI Policy

        1.      Code Upgrades Coverage

        The terms of the Westchester Policy apply to the RSUI Policy. Increased costs of construction due to ordinances or laws in place at the time of loss regulating repairs or rebuilding are covered by the Westchester Policy's code upgrades endorsement. However, the Westchester Policy provides that the insurer will not pay for such code upgrades unless the repairs or replacement are made within two years (unless extended by the insurer in writing during that two-year period). And here, there were (1) no repairs or replacement within two years; (2) RSUI did not extend the two-year time period for increased costs of construction due to codes, ordinances, or laws; and (3) Southland did not suggest to RSUI that it intended to sell the Property until January 2008, more than four months after August 29, 2007.

        The requirement of repairs or replacement occurring was a condition of performance by RSUI regarding payment of proceeds under this provision. *See* Restatement (Second) of Contracts § 224 (1981) ("A condition is an event, not certain to

18

occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due."). Performance under a contract becomes due only when all necessary conditions have occurred. *Id.* cmt. b; Restatement (Second) of Contracts § 225(1), at 165 (1981); *Hess v. N. Pac. Ins. Co.*, 859 P.2d 586, 588 (Wash. 1993) (stating that "liability of the company does not exist until repair or replacement is made"); *Huggins v. Hanover Ins. Co.*, 423 So. 2d 147, 150 (Ala. 1982) ("A party who has not repaired or replaced his insured building has not complied with the condition precedent to recovery under the policy and so cannot recover.").

The unexcused "non-occurrence of a condition discharges the duty when the condition can no longer occur." Restatement (Second) of Contracts § 225 (1981); *accord* Allan Farnsworth, *Farnsworth on Contracts* § 8.3, at 421 (Aspen 2004) ("[I]f a time comes when it is too late for the condition to occur, the obligor is entitled to treat its duty as discharged."). A discharged duty is no longer enforceable. *See* Farnsworth, *supra*, § 8.3, at 422; *see also Bourazak v. N. River Ins. Co.*, 379 F.2d 530, (7th Cir. 1967) (finding in an Illinois case about repair and replacement coverage that caselaw involving an insurer's absolute refusal to pay in any event "is not pertinent to the instant situation where the insurer denied liability only as to the Extended Coverage provision and such denial was made some two months subsequent to the expiration of the time within which plaintiff was required to meet a precedent condition").

By the terms of the RSUI Policy and the Westchester Policy, Southland waited too long and its window for receiving code upgrade proceeds expired. Any duty on RSUI's part for code upgrades was discharged on August 29, 2007. Plaintiffs' argument

for excusing the condition of repair or replacement is anticipatory breach (discussed in more detail below), but RSUI cannot be found to have anticipatorily breached any possible obligation that had been discharged four months earlier. No repudiation by RSUI in January 2008 could have revived any such duty. "[C]onditionality presupposes some degree of risk arising out of uncertainty as to whether the event will occur." Farnsworth, *supra*, § 8.2, at 418. Here, Southland assumed that risk.

Plaintiffs' only worthy argument is that RSUI failed to note this two-year deadline in its letters rejecting any future obligations if Southland sold the property, thus waiving this point. But the argument is not persuasive. Under Mississippi law, "[w]aiver is the voluntary relinquishment of known right." *Lynch v. Miss. Farm Bureau Cas. Ins. Co.*, 880 So. 2d 1065, 1071 (Miss. Ct. App. 2004); *accord Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 212-13 (5th Cir. 2009) ("Mississippi law defines a waiver as 'an intentional surrender or relinquishment' of a known and existing right, and contemplates something done designedly or knowingly, which modifies or changes existing rights or varies or changes the terms and conditions of a contract."); Jeffrey Jackson, *Mississippi Ins. Law & Practice* § 7:2 (2010). But the waiver doctrine cannot be used to create coverage or expand existing coverage to risks that are expressly excluded by a policy. *Stewart v. Gulf Guar. Life Ins. Co.*, 846 So. 2d 192, 202 (Miss. 2003).

RSUI did not relinquish voluntarily any right under the two-year clause for code upgrades. Neither Steber's March 12, 2008, letter nor Murphy's July 29, 2008, letter mentioned the two-year time limit. Those letters reserved all other rights under the RSUI Policy, whether or not mentioned at that time, and stated that any failure to raise other

terms and conditions of the RSUI Policy in the letters "should not be deemed a waiver of RSUI Indemnity Company's right to do so in the future should circumstances warrant." (Evans Aff. filed 1/21/09 Ex. 5 at 2; PSUMF ¶ 17; Def.'s Resp. ¶ 17; West Decl. filed 1/21/09, Ex. 3 at 3.)

No express waiver or voluntary relinquishment of the two-year time limit was made. And in light of RSUI's reservation of rights under other provisions of the RSUI Policy, no implied waiver may be found and no reasonable jury would conclude otherwise. Moreover, the doctrine of waiver cannot be used to extend coverage to increased costs that occur outside the period delimited by the policy. Thus, summary judgment will be denied to plaintiffs and granted in defendant's favor on the issue of code upgrade proceeds.

2.      Replacement Cost Coverage

The Policies provide that no insurance payments for repair or replacement costs will be made until repair or replacement occurs and at the time of RSUI's July 29, 2008, letter repair or replacement of the Property had not begun. Even as of February 20, 2009, (the date of Steber's affidavit relating to the pending summary judgment motions), the Property had not been repaired or replaced.[5]

Under Mississippi law, a "standard insurance policy is a contract, and its terms are a matter of usual contract interpretation unless some statutory imperative controls." *Lynch*, 880 So. 2d at 1070. Any ambiguity in the policy's terms is resolved against the insurance company. *Lynch*, 880 So. 2d at 1070. Here, under the

---

[5]The court provided plaintiffs with an opportunity to submit evidence that the Property was repaired or replaced subsequent to briefing of the summary judgment motions, but they chose not to do so.

unambiguous terms of the RSUI Policy and Westchester Policy, repair or replacement is a condition to the payment of any replacement cost insurance proceeds. *See Conrad Bros. v. John Deere Ins. Co.*, 640 N.W.2d 231, 239 (Iowa 2001) ("Schott was required to replace the damaged buildings in order to qualify for replacement cost coverage. The parties agree that this provision operates as a condition precedent to recovery of replacement costs."); *Huggins v. Hanover Ins. Co.*, 423 So. 2d 147, 150 (Ala. 1982) (stating that a requirement that repair or replacement be made to recover more than actual cash value "ha[s] been interpreted as providing a condition precedent to an insurer's duty to pay repair or replacement costs"); 12 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance 3d* § 176:60, at 176-54 (2005) (stating regarding replacement cost provisions that "the policy may expressly mandate rebuilding as a condition to recovery").

Plaintiffs rely on the doctrine of anticipatory breach to excuse the condition. Authorities on contract law identify the doctrine as "anticipatory repudiation," meaning a "party's repudiation of its duty before the time for performance has arrived." Farnsworth, *supra*, § 8.20, at 550.

The Supreme Court of Mississippi defines an anticipatory breach of contract as "one committed before the time has come, when there is a present duty of performance, and is the outcome of words or acts evincing an intention to refuse performance in the future. If it does not precede the time of performance–it is not anticipatory." *Little v. Dalrymple*, 242 Miss. 365, 371, 135 So. 2d 403, 405 (1961). The refusal to perform has to be positive and unconditional. *See id.*; Farnsworth, *supra*, § 8.21, at 559 ("The statement must be sufficiently positive to be reasonably understood as meaning that the

22

breach will actually occur."); Restatement (Second) of Contracts § 250 cmt. b., at 273 (1981).

The parties have not discussed sufficiently whether one or both refusal letters by RSUI constituted definite and unequivocal repudiation.[6]  "Doubtful and indefinite statements that the performance may or may not take place and statements that, under certain circumstances that in fact do not yet exist, the performance will not take place, will not be held to create an immediate right of action."  10 Corbin, *supra*, § 973, at 86. Although a difference of opinion as to interpretation of a contract's legal effect is not necessarily a definite and unequivocal repudiation, it is so if "accompanied by a clear manifestation of intention not to perform in accordance with any other interpretation."  *Id.* at 91.

It appears that Murphy's July 2008 letter can be considered a repudiation. Evans asked RSUI to affirm that it would comply with the terms of the RSUI Policy by issuing a check for replacement cost proceeds upon completion of repairs to the Property, and she answered that the request was "denied."  Moreover, Steber's March 2008 letter may constitute a repudiation although it is less clear.  The March 2008 letter stated that "if Southland Management sells the subject property prior to incurring any repair/replacement/code upgrade costs, any prospective purchaser will similarly be prohibited from collecting any repair/replacement/code upgrade costs."  (West Decl. filed

---

[6]Under Mississippi's definition, and based on the record here, Steber's comments in the December 2007 telephone call were not an unequivocal and definite repudiation.  At most he said that he "thought" assignment of any post-loss claim would be excluded under the no-transfer provision, and it is unclear whether he was authorized to make a determination without checking with RSUI first.  Moreover, plaintiffs have stated that their summary judgment motion "is predicated on RSUI's denial as set forth in the March 12, 2008 letter by Mr. Steber and the July 29, 2008 letter by Attorney Courtney Murphy."  (Pls.' Resp. ¶ 21.)

1/21/09, Ex. 3 at 2.)  This statement is qualified, and under certain circumstances, not yet in existence, it takes into account that performance may not be required.  However, the March 2008 letter could be interpreted as something more.  But no decision needs to be made on this issue right now.  For present purposes, the court proceeds as though the March 2008 letter was a repudiation.  And because summary judgment cannot be granted for either party, this issue can be raised later, if needed.

Assuming each of the March and July 2008 letters constituted a positive and unconditional refusal to perform a duty, it could be argued under *Little* that RSUI committed no anticipatory breach because it was under no *present* duty of performance.  When a contract contains a condition, "[e]ach obligor comes under a duty as soon as the contract is made, but that duty is conditional.  The obligor need not render performance until the occurrence of the event on which the obligor's duty is conditioned . . . ."  Farnsworth, *supra*, § 8.2 at 415.  The nonoccurrence of a condition entitles the obligor "to suspend performance on the ground that the performance is not due as long as the condition has not occurred."  *Id.* § 8.3, at 421; *see also* 13 Richard A. Lord, *A Treatise on the Law of Contracts by Samuel Williston* § 38:7, at 394, 405 (4th ed. 2000) (stating that a condition precedent "must be performed or happen before a duty of immediate performance arises on the promise which the condition qualifies" and that "a promisor's duty does not become absolute unless and until a condition precedent occurs").

However, *Little* did not involve a situation of condition precedent.  Little had declared that he was not going to work Dalrymple's land as agreed; Little's performance

24

was not contingent on any agreed-upon event or action by Dalrymple. *See Little*, 242 Miss. at 368-72, 135 So. 2d at 403-06.

More recently, the Supreme Court of Mississippi confirmed that the doctrine of anticipatory breach applies in a situation involving conditions precedent, stating "[a] repudiation or other total breach relieves performance of conditions precedent." *Warwick v. Matheny*, 603 So. 2d 330, 337 (Miss. 1992).[7] Thus, repudiation of a performance that has not become due may constitute an anticipatory breach.

In so determining, the Supreme Court of Mississippi is in accord with authorities to which that court has looked for principles regarding anticipatory breach. For instance, the *Warwick* court cited *Corbin on Contracts* and the Restatement (Second) of Contracts respecting the excuse of conditions precedent upon an anticipatory breach. 603 So. 2d at 338.

According to *Corbin on Contracts*,

[i]t is now the generally prevailing rule in both England and the United States that a definite and unconditional repudiation of

---

[7]In addition, *Consolidated American Life Insurance Co. v. Covington*, 297 So. 2d 894 (Miss. 1974), held that conditions in a contract placed upon one party may be excused when the other party breaches the contract and prevents the conditions from being met.

> If the Insurance Company refused to make the loan in compliance with its contract for reasons of its own, which were not a part of the contract, it in effect excused and prevented the Covingtons from performing the necessary conditions required of them in the contract.
>
> It has been said by this Court that where the performance of a contract is prevented by either party, the other who is willing to perform is entitled to damages from the other sufficient to compensate him for the loss.

*Id.* at 896. The case involved excused conditions in the context of an actual breach, *see id.* at 895, rather than in the context of an anticipatory breach where conditions precedent exist, but the same considerations apply in the latter context as well.

Further, *Wander Limited v. Krouse & Co.*, 368 So. 2d 235 (Miss. 1979), addressed the definition of anticipatory breach under the Mississippi Uniform Commercial Code, Miss. Code Ann. § 75-2-610 (1972), which stated that "[w]hen either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may . . . resort to any remedy for breach." No one contends that the present case falls under the UCC but the UCC rule appears to be the same as the common law rule on anticipatory breaches when a condition exists.

the contract by a party thereto, communicated to the other, is a breach of the contract, creating an immediate right of action and other legal effects, even though it takes place long before the time prescribed for the promised performance and before conditions specified in the promise have ever occurred.

10 Arthur Linton Corbin, *Corbin on Contracts* § 959, at 42-43 (interim ed. 2007). Corbin continues in another section: "If the time for the defendant's promised performance was not definitely fixed in the contract but the defendant promised to perform . . . as soon as the plaintiff should have performed certain conditions precedent, a repudiation by the defendant is regarded by all courts without exception, as a breach of the contract, creating an immediate right of action. . . . All agree . . . that the defendant's repudiation excuses the plaintiff from performing conditions precedent . . . ." 10 Corbin, *supra*, § 970, at 78-79; *see also id.* § 977, at 98.

A Treatise on the Law of Contracts by Samuel Williston* and *Farnsworth on Contracts* are in accord. "It is well settled that a repudiation of the contract by one party relieves the nonrepudiating party of the duty to preform any conditions precedent that may exist to the performance of the repudiating party." 13 Richard A. Lord, *A Treatise on the Law of Contracts by Samuel Williston* § 39:39, at 672 (4th ed. 2000); Farnsworth, *supra*, § 8.6, at 458. However, "the breach that excuses a condition must be causally connected to its nonoccurrence." Farnsworth, *supra*, § 8.6, at 458. In other words, "[i]t is essential that the promisor's conduct in repudiating the contract be the cause of the promisee's failure to perform a condition precedent." 13 Lord, *supra*, § 39:41, at 690.

According to *A Treatise on the Law of Contracts by Samuel Williston*, the law "recognizes the obvious injustice of requiring the nonrepudiating party to perform [a

condition] when the promisor has indicated that he or she will not keep his or her promise." 13 Lord, *supra*, § 39:38, at 670. "If the promisor is not going to keep his promise in any event, it is useless to perform the condition and the promisor becomes liable without such performance." *Id.* § 39:39, at 673-74; *accord* Restatement (Second) of Contracts § 255 cmt. a., at 292 (1981).

Nevertheless, all of these authorities concur that the allegedly injured party "must prove that it could have performed absent the repudiation." Farnsworth, *supra*, § 8.20, at 553; *see id.* § 8.22, at 565-66 n.6; 10 Corbin, *supra*, § 978, at 101 ("[I]t is still a condition precedent to the plaintiff's right to a judgment for damages that he should have the ability to perform all such conditions."); 13 Lord, *supra*, § 39:41 ("[T]he rule excusing the nonoccurence of conditions precedent where there has been a repudiation of the contract by the party whose performance is conditional does not apply when the promisee could not or would not have performed the condition in any event . . . ."); Restatement (Second) of Contracts § 255 cmt. a., at 292 (1981) ("[I]f the condition would not have occurred in any event, its non-occurrence is not excused. In such a case both parties are discharged."). The party claiming injury must be able to show that before the repudiation it "was ready, willing and able to perform, and would have rendered that performance had the other party not repudiated." 13 Lord, *supra*, § 39:41, at 695.

Assuming Steber's March 2008 and Murphy's July 2008 letters repudiated any duty of RSUI under the RSUI Policy (assuming one existed) to pay repair and replacement costs to an assignee if the Property was transferred, the repudiation relieved plaintiffs (whether one or both will be addressed below) of satisfying the condition

precedent of actually repairing or replacing the Property. The condition precedent was excused as of the date of the repudiation.

The next question is whether RSUI actually repudiated a duty imposed by its policy. Generally, a party's good faith or "honest but mistaken understanding of its rights under the contract . . . . will not prevent the statement from amounting to a repudiation." Farnsworth, *supra*, § 8.21, at 561. Was RSUI correct in its belief that a sale of the Property terminated any obligation RSUI would have to pay replacement proceeds to Southland or Edgewood Manor? If RSUI was correct, then after the Property was sold it had no duty to perform and nothing to repudiate.

The Supreme Court of Mississippi has summarized its view of common law respecting assignments of contracts as follows: "Mississippi law permits an assignment of contractual rights. Assigned contractual rights may be enforced by the assignee—who essentially 'stands in the shoes' of the assignor and who 'takes no rights other than those' which the assignor had possessed." *Great S. Nat'l Bank v. McCullough Envtl. Servs., Inc.*, 595 So. 2d 1282, 1287 (Miss. 1992).

In general, a valid assignment takes effect without the obligor's consent. *Id.* at 1287 n.5. However, a "contractual provision prohibiting an assignment may . . . invalidate an assignment." *Id.* In other words, a contractual prohibition against assignment of the contract is permitted. *Merch.'s & Farmer's Bank v. McClendon*, 220 So. 2d 815, 820-21 (Miss. 1969). A contract right may be assigned unless (1) the substitution of the assignee for the assignor would vary materially the duty of the obligor, increase the obligor's burden, or impair its chance of obtaining return performance; (2) forbidden by law;

28

or (3) prohibited by the contract creating the right. *Id.* at 821. "The right to make a personal contract or to agree for the performance of a contract by a certain party to the exclusion of all others is obviously legitimate." *Id.* at 820 (quoting *Inter-S. Life Ins. Co. v. Humphrey*, 122 Miss. 579, 592, 84 So. 625, 626 (1919)).

Reasons for a nonassignability clause include protecting the insurer from having to deal with individuals other than those named in the policy; multiple claimants to payments; and increased risk, as insurers select their risks after underwriting consideration and may have chosen not to bear a different risk. 3 Lee R. Russ & Thomas L. Segalla, *Couch on Insurance 3d* § 35:3, at 35-5 to 35-6 (2005).

Nevertheless, the right to receive money due or to become due under a contract "may be assigned even though the contract itself may not be assignable. A contract to pay money may be assigned by the person to whom the money is payable, unless there is something in the terms of the contract manifesting the intention of the parties that it shall not be assigned." *Merch.'s & Farmer's Bank*, 220 So. 2d at 821; *accord Ayers v. State Farm Fire & Cas. Co.*, No. 1:06CV1261 LTS-RHW, 2007 WL 1378401, *3 (S.D. Miss. May 7, 2007) ("Mississippi cases also draw a distinction between the assignment of a contract and the assignment of money that may be due or may become due under a contract. The latter may be validly assigned even where the underlying contract expressly prohibits assigning the contract itself.").[8] An assignment of money due or to become due under an insurance policy "is not an assignment of the insureds' *rights*

---

[8]In the *Merch.'s & Farmer's Bank* case, for instance, the contract between the defendant, McClendon, a prime contractor, and Ladner, a subcontractor, prohibited assignment of the contract and any money due or to become due under the contract. 220 So. 2d at 817, 820. The Supreme Court of Mississippi enforced the contractual provision against the Bank to which Ladner had assigned proceeds before they were due. *Id.* at 820-21.

under their policy or of the insureds' *claims* against their insurer under their policy." *Ayers*, 2007 WL 1378401, at *2.[9]  Instead, what is being assigned is "regarded as chose in action rather than transfer of actual policy."  2 Steven Plitt, et al., *Couch on Insurance 3d* § 34:25, at 34-33 (rev. ed. 2010).  Mississippi law's recognition that proceeds may be assigned applies to contracts in general, and thus to insurance contracts.  *See Lynch*, 880 So. 2d at 1070 (stating that under Mississippi law a "standard insurance policy is a contract, and its terms are a matter of usual contract interpretation unless some statutory imperative controls.").

The no-transfer clause of the RSUI Policy provided that Southland's "rights and duties under this policy may not be transferred without [RSUI's] written consent except in the case of death of an individual named insured."  (Def.'s Resp. ¶ 5; DSUMF ¶ 5.) Obviously, Southland is not an individual to which the death exception can apply, and it is undisputed that RSUI did not provide written consent to any transfer of rights and duties

---

[9]The Supreme Court of Mississippi addressed a no-transfer clause under the Mississippi Uniform Commercial Code in *Mississippi Bank v. Nickles & Wells Construction Co.*, 421 So. 2d 1056 (Miss. 1982).  It found that a contract provision prohibiting the assignment of money due or to become due under the contract was ineffective to prevent the creation of a security interest.  *Id.* at 1059-60.  However, the case was based on the statutory provision, Miss. Code Ann. § 75-9-318(4) (1972), stating that a "term in any contract between the account debtor and an assignor is ineffective if it prohibits assignment of an account or prohibits creation of a security interest in a general intangible for money due or to become due or requires the account debtor's consent to such assignment or security interest.

No one in the present case suggests that the UCC applies.  However, the comments to § 75-9-318(4) adopted by the Mississippi legislature recognized the shift from old law:

> There can be no doubt that a term prohibiting assignment of proceeds was effective against an assignee with notice through the nineteenth century and well into the twentieth. . . . but the changing character of the law is shown in the proposed Section 154 of the Restatement, Second, Contracts.

> The original rule of law has been progressively undermined by a process of erosion . . . . The cases are legion in which courts have construed the heart out of prohibitory or restrictive terms and held the assignment good. . . .

Miss. Code Ann. § 75-9-318 cmt. (4) (repealed eff. Jan. 1, 2002 by Laws 2001, ch. 495).

under the policy.  Moreover, Southland had no "duties" to transfer regarding the damage to this Property.  And as set forth in the case law just discussed, an assignment of proceeds is not the same as an assignment of "rights."  Because the no-transfer clause in this case does not expressly prohibit the assignment of proceeds, the general statement in *McClendon* that proceeds "may be assigned even though the contract itself may not be assignable" applies.

But what did Southland assign—proceeds or contractual rights?  This is the central question.  At the time the Property was sold, a loss had occurred under the RSUI Policy, but no money was due because no repairs or replacement had occurred.  Could money become due in the future after Southland sold the Property?  No Mississippi law appears on point and this court is not permitted to certify the question, Miss. R. App. Pro. 29(a).  Thus, this court must do its best to predict how the Mississippi Supreme Court would rule.

Several authorities discuss the occurrence of *loss*, rather than a present entitlement to an actual insurance payment, as the key point in time for conversion of rights under an insurance policy to a claim for proceeds for assignment purposes.  For instance, *Couch on Insurance 3d* states:

> [I]t is the generally accepted rule that a policy of insurance, or a claim accrued thereunder, may be effectively assigned after *loss* or death so as to vest in the assignee an absolute right to the insurance—provided, of course, that the assignment is otherwise valid.  The consent of the insured is not necessarily required.
>
> Further, a provision in a policy of insurance which prohibits its assignment except with the consent of the insurer

> does not apply to prevent assignment of claim or interest in the insurance money then due after the *loss*.

2 Steven Plitt, et al., *Couch on Insurance 3d* § 34:2, at 34-7 to 34-8 (rev. ed. 2010) (footnotes omitted) (emphasis added). According to *Couch on Insurance 3d*, "[a]s a general proposition, the *loss* creates a right to payment of a sum of money; that right to payment is no longer speculative and the courts will honor the ability to assign." 2 Plitt, *supra*, § 34:2, at 34-9 (emphasis added).

> [T]he great majority of courts adhere to the rule that general stipulations in policies prohibiting assignments thereof except with the consent of the insurer apply only to assignments before loss, and do not prevent an assignment after loss, for the obvious reason that the clause by its own terms ordinarily prohibits merely the assignment of the policy, as distinguished from a claim arising thereunder, and the assignment before loss involves a transfer of a contractual relationship while the assignment after loss is the transfer of a right to a money claim.
>    . . . .
>
> This general rule is applicable to prevent a liability or indemnity insurance policy's express prohibition of an assignment without the consent of the insurer from barring an assignment of the policy or right thereunder after the event has occurred by which liability under the policy is fastened upon the insurer.

3 Russ & Segalla, *supra*, § 35:7, at 35-8 to 35-9 (footnotes omitted).

Appleman's *Insurance Law and Practice* states that "[w]here the insured property was destroyed, the policy after such destruction became a mere chose in action, which could be assigned just like any other chose in action." 5A John Alan Appleman & Jean Appleman*, Insurance Law & Practice* § 3458, at 406 (rev. ed. 1970). The supplement indicates that an insurer may not limit the insured's ability to assign rights under a policy

"after the occurrence of an event which gives rise to the insurer's liability." 5A Appleman, *supra*, § 3458, supp. at 141 (cumm. supp. 2010).

The general rule is that anti-assignment clauses are limited to pre-*loss* assignments of insurance contracts. *Star Winshield Repair, Inc. v. W. Nat'l Ins. Co.*, 768 N.W.2d 346, 350 n.6 (Minn. 2009); *id.* at 351 (Anderson, J., concurring). Even this court, in a case under Wisconsin law, has found it "well established that after an insurance loss occurs, the claim is similar to a debt or any other chose in action and may be assigned" and that prohibiting an assignment of such an insurance claim would be contrary to public policy and void. *Straz v. Kan. Bankers Sur. Co.*, 986 F. Supp. 563, 569 (E.D. Wis. 1997) (citing *Max L. Bloom Co. v. U.S. Cas. Co.*, 191 Wis. 524, 535-36, 210 N.W. 689 (1926)). However, for these authorities the loss triggered or set the insurer's liability; no conditions precedent existed. For instance, the right to proceeds in *Straz* was complete; the situation did not involve a condition precedent to recovery. *See id.* at 564-69.

Under Mississippi law a "chose in action" is "a thing in action, and is the right of bringing an action, or a right to recover a debt or money, or a right of proceeding in a court of law to procure the payment of a sum of money, or a right to recover a personal chattel or a sum of money by action." *Citizens Nat'l Bank v. Dixieland Forest Prods., LLC*, 935 So. 2d 1004, 1007 n.5 (Miss. 2006). Here, because the condition precedent had not been met as of the date of assignment, the right to proceeds was not absolute and the insured and insurer were not like a creditor and debtor. So the plaintiffs' claim against RSUI is in a grey area between the "loss" and an actual claim to proceeds.

Nevertheless, for several reasons this court believes the Supreme Court of Mississippi would find the plaintiffs' assignment more akin to an assignment of proceeds than to assignment of rights under the insurance policy.

First, notwithstanding that the Property had not been repaired or replaced at the time of assignment, the insurer's liability and the extent of that liability were "set" by the loss, but at the option of the insured. Regardless of who would later own the Property or complete the repairs and replacement, the value of the building on the date of Hurricane Katrina would not change. Regardless of whether Southland or Edgewood Manor would pay for completion of repairs or replacement, the insurance coverage provided for payment for a similar type of building and that was already locked in. Therefore, for the reasons stated by the authorities discussed above, the occurrence of the loss remains the key date for transferability purposes.

A district court discussed assignability under Pennsylvania law as not merely involving the date of "loss" but rather "the occurrence of the event which gives rise to the insurer's liability" and the vesting of a right to proceeds. *Viola v. Fireman's Fund Ins. Co.*, 965 F. Supp. 654, 658 (E.D. Pa. 1997). After the event, the interest in indemnity becomes a fixed right. *Id.* (citing Pennsylvania law and *Couch*). Here, the occurrence of Hurricane Katrina gives rise to RSUI's liability.

Second, treating the plaintiffs' assignment as one of proceeds comports with the purposes of nonassignability clauses. Nonassignability clauses are acceptable to prevent an increase of risk for the insurer. Yet "where the assignment is of the right to recover against the policy for a loss that has already occurred, there is no increase in risk to the insurer." 3 Plitt, *supra*, § 34:2 n.1. According to the Ninth Circuit, "[w]hen the loss

occurs before the transfer . . . the characteristics of the [assignee] are of little importance: regardless of any transfer the insurer still covers only the risk it evaluated when it wrote the policy." *N. Ins. Co. v. Allied Mut. Ins. Co.*, 955 F.2d 1353, 1358 (9th Cir. 1992), *quoted in Star Winshield Repair, Inc.*, 768 N.W.2d at 351 (Anderson, J., concurring); *see also Viola*, 965 F. Supp. at 659. Here, RSUI's risk did not increase with assignment of the Property; while it may receive what could be considered a windfall if Southland or its assignee did not repair or rebuild, its maximum payment was set as of the date of Hurricane Katrina.

Nonassignability clauses also protect an insurer from multiple claimants to payments. Here, multiple claimants are not an issue, as by virtue of this lawsuit, the court can determine which party may be entitled to eventual proceeds. To the extent that RSUI would have to deal with an entity other than the named insured, interactions would likely not be extensive as would be the case if the full policy were assigned.

In general, the performance of a condition can be delegated unless the obligor has a substantial interest in having a particular person perform the act required. *See* Restatement (Second) of Contracts § 319, at 22 (1981). Rebuilding the Property is not in the nature of a personal service. It is reasonable to believe that Southland would not have rebuilt the property but that it would have hired a contractor or builder to do so, and that delegation of that task would have been permissible. Hence, whether Southland or Edgewood Manor hires the contractor appears immaterial.

Next, treating the plaintiffs' assignment as one of proceeds comports with the one case that appears on point. *Conrad Brothers v. John Deere Insurance Co.*, 640 N.W.2d 231 (Iowa 2001), involved a very similar set of facts as the present case, including

a no-transfer clause prohibiting the transfer of "rights and duties" under the policy without the insurer's consent, *id.* at 237 n.1. The insurance policy contained repair and replacement coverage, but repair or replacement had to occur before any such costs would be reimbursed by the insurer. *Id.* at 233-34. Shortly after the occurrence of wind damage the insured defaulted on the mortgage and assigned its interest in proceeds to the lender. *Id.* at 233-35. At the time the lender sued the insurer no repair or replacement had been made; the lender relied on the insurer's anticipatory repudiation to excuse the condition precedent. *Id.* at 235.

The Supreme Court of Iowa referenced authority stating that the key is when the *loss* occurs, finding that the replacement proceeds could be recovered by the lender:

> The anti-assignment provision did not specify whether it applied to assignments executed before or after the loss. However, general stipulations prohibiting assignments absent an insurer's consent have been held to apply only to pre-loss assignments. The great weight of authority supports the rule that an anti-assignment clause does not apply to the assignment of claims arising after the loss. Moreover, even if the provision had specifically prohibited post-loss assignments, it would most likely be in contravention of public policy and the general purpose of indemnity contracts.

*Id.* at 236-37 (citations omitted). The court explained its rationale as follows:

> The primary reason for the prohibition of assignments prior to loss absent an insurer's consent is to protect the insurer against increased risks of loss resulting from an assignment of coverage to a new insured. The assignee may present a greater risk of loss to the insurer than the original insured. However, the need to protect the insurer no longer exists after the insured sustains the loss because the liability of the insurer is essentially fixed. . . . Furthermore, once the loss has triggered the liability provisions of the insurance policy, an assignment is no longer regarded as a transfer of the actual

36

policy. Instead, it is a transfer of a chose in action under the policy.

*Id.* at 237-38 (citations omitted). The court found that the assignment occurred after the loss, and permitted the lender to step into the insured's shoes. *Id.* at 238. Because the lender was ready, willing, and able to comply with the condition precedent at the time of the repudiation, the condition precedent was excused and the lender was entitled to damages based on the full replacement costs. *Id.* at 242.

RSUI cites *Tiffin Avenue Investors v. Midwestern Indemnity Co.*, as contrary authority, but this court finds *Tiffin* distinguishable. In *Tiffin* the Ohio Court of Appeals held that an insured had to repair or replace damaged property with due diligence and dispatch before its assignee could recover repair and replacement cost insurance proceeds. No. 5-85-22, 1987 WL 12099 (Ohio App. May 28, 1987). As the insured did not repair or build a replacement structure before it sold the property to the assignee, and the assignee had rebuilt the property, no insurance proceeds were due. *Id.* at *6-*7. However, the insurance policy in *Tiffin* referenced the "insured" regarding the repair and replacement endorsement, stating that the insurer was not liable for any loss under the endorsement "unless and until the damaged or destroyed property is actually repaired or replaced by the Insured with due diligence and dispatch." *Id.* at *3. The court found that the provision plainly required that "it is the insured who must repair or replace the damaged property before any amount becomes due." *Id.* at *6.

Unlike the policy in *Tiffin*, the policy in the present case does not specify that the *insured* must complete the repairs or replacement; here, the policy states only that repairs or replacement must be made before payment. *Who* can make the repairs or

37

replacement is not specified, and contracts are construed against the drafter, *see Warwick*, 603 So. 2d at 340-41.

RSUI also places reliance on *Star Windshield Repair, Inc. v. Western National Insurance Co.*, 744 N.W.2d 237 (Minn. Ct. App. 2008), which has now been reversed on key points regarding assignment of proceeds, *Star Windshield Repair, Inc. v. W. Nat'l Ins. Co.*, 768 N.W.2d 346 (Minn. 2009). Thus, the court believes the Supreme Court of Mississippi would find the assignment of Southland's right to repair or replacement proceeds to Edgewood Manor—post-loss but prior to actual repair or replacement—to be valid.

As assignee, Edgewood Manor steps into the shoes of Southland and gains only that to which the assignor is entitled; Edgewood Manor takes with the claim whatever limitations it had in the hands of Southland. *See Bronx Entm't, LLC v. St. Paul's Mercury Ins. Co.*, 265 F. Supp. 2d 359, 361 (S.D.N.Y. 2003); *Great S. Nat'l Bank v. McCullough Envtl. Servs., Inc.*, 595 So. 2d at 1287; 5A Appleman, *supra*, § 3461, at 416, § 3462, supp. at 146 (stating that the assignee is subject to all defenses the insurer could have asserted against the insured).

By virtue of its incorporation of the Westchester Policy, the RSUI Policy required repair or replacement within a reasonable time. The date of RSUI's earliest possible anticipatory breach, March 12, 2008, was the earliest date on which the condition precedent of actual repair or replacement was excused. That was approximately two and one-half years after Hurricane Katrina. Consequently, there is a question of fact as to

whether as of March 12, 2008, a reasonable time for repair and replacement had already passed, thus extinguishing any entitlement to repair or replacement reimbursement.

According to *Couch on Insurance 3d* there is no firm rule regarding what constitutes an appropriate time for completion in light of the varied circumstances that could exist, "including the size and complexity of the structure, local building industry conditions, and so on." 12 Russ & Segalla, *supra*, § 176:64, at 176-57. "Due diligence is all that appears to be required . . . ." *Id.* One jury has found that two and one-half years from the date of damage was not unreasonable for purposes of a repair and replacement cost provision. *Lerer Realty Corp. v. MFB Mut. Ins. Co.*, 474 F.2d 410, 413 (5th Cir. 1973). Yet a federal district court in Missouri, applying Mississippi law regarding flood and hurricane damage, found that as of May 2008 the plaintiff had been unreasonable in not repairing the property and dismissed a claim for replacement cost value. *Maxus Realty Tr., Inc. v. RSUI Indem. Co.*, No. 06-0750-CV-W-ODS, at *2 (W.D. Mo. May 16, 2008). However, that opinion barely discusses the facts and does not make clear whether the tardiness of the insured in replacing the property ran from Hurricane Katrina or some other hurricane. *See id.* at *1-*2.

Here, the record contains no evidence regarding the condition of the Property following Hurricane Katrina for purposes of repair or rebuilding, or the status of the construction industry in that community after Hurricane Katrina, or whether repair or replacement could be scheduled and completed as required. The court cannot say that no reasonable jury could find that two and one-half years following Hurricane Katrina was

39

an unreasonable amount of time to repair or replace the Property. Nor can it say that no reasonable jury could find the opposite. Thus, the issue is one for trial.

Further, a question of fact exists as to whether Southland (during its ownership of the Property) and Edgewood Manor (following the assignment of some "interest"), were ready, willing, and able to perform the condition precedent. As of the date of the anticipatory repudiation, the nonrepudiating party must have had the ability to perform the condition precedent. *See* Farnsworth, *supra*, § 8.20, at 553, § 8.22, at 565-66 n.6; 10 Corbin, *supra*, § 978, at 101; 13 Lord, *supra*, § 39:41. If the condition would not have occurred in any event, both parties are discharged. Restatement (Second) of Contracts § 255 cmt. a., at 292 (1981). For instance, in *Conrad Brothers*, the assignee showed through testimony that it had incurred or was ready and able to incur over $60,000 in expenses for a replacement building. 640 N.W.2d at 242.

Insufficient evidence exists on this point; a reasonable jury could find either way. Southland had received over $3.5 million in actual cash value payments and it had not started any repair or replacement. Moreover, the conditions of the Property and the status of the local construction industry have not been established.

There is the possibility that Southland's claim against RSUI may be dismissed and that only Edgewood Manor's claim may continue. It appears that when Southland notified RSUI of its intent to sell the property and to assign its right to proceeds, the entity for which Southland was managing general partner owned the Property. However, RSUI did not repudiate its duty under its Policy until *after* Southland sold the Property. Southland wrote to RSUI in December 2007 and in early January 2008. But, Southland sold the

40

Property in February 2008, and the building had not been repaired or replaced before the sale. RSUI did not repudiate any duty it may have had until March 2008.

If Southland assigned all of its right to proceeds upon the sale then at the time of repudiation RSUI owed Southland no duty at all. And, when the terms of an assignment indicate the assignor's and assignee's intention to convey all of the assignor's rights in the thing being assigned, the assignor thereafter has no further interest in the matter. *See Ayers*, 2007 WL 1378401, at *3; *Wilson*, 761 So. 2d at 917. However, where an insurer's legal obligation has not yet been liquidated, the assignment is contingent on recovery under the insurance policy, and the assignment reserves some rights under the insurance policy to the assignor, the assignor still has rights in the policy. *See Ayers*, 2007 WL 1378401, at *3. In this case, the terms of the assignment are unclear and the record does not show whether all rights to proceeds were assigned. All the court has been told is that Edgewood Manor has some "interest"; the extent of that interest is unknown. But if all rights to proceeds were indeed assigned it would serve as reason for the eventual dismissal of Southland's claim. At trial the plaintiffs will have to establish that they retain an interest in the proceeds.

C.    Bad Faith/Extracontractual Damages Claim by Southland

Mississippi law recognizes two levels of extra-contractual damages based on the nature of conduct by the insurance company in handling a claim. *Essinger v. Liberty Mut. Fire Ins. Co.*, 534 F.3d 450, 451 (5th Cir. 2008) ("*Essinger II"*). Punitive damages may be awarded for egregious conduct, while lesser damages such as attorney's fees or amounts for inconvenience and expense, may be available "where the insurer lacks an

41

arguable basis for delaying or denying a claim, but the conduct was not sufficiently egregious to justify the imposition of punitive damages." *Id.*; *see Universal Life Ins. Co. v. Veasley*, 610 So. 2d 290, 295 (Miss. 1992). The lesser extracontractual damages may be imposed when the insurer fails to pay a valid claim through negligence. *Essinger II*, 534 F.3d at 451; *Veasley*, 610 So. 2d at 295.

To recover punitive damages against an insurance company for bad-faith refusal to pay a claim or to honor an obligation under an insurance policy, the insured must (1) succeed on a contract claim, demonstrating that a claim existed or an obligation was owed; (2) prove that the insurer lacked an arguable basis for denying the claim; and (3) show that the insurer committed a willful or malicious wrong or acted with gross and reckless disregard for the insured's rights. *Essinger v. Liberty Mut. Fire Ins. Co.*, 529 F.3d 264, 271 (5th Cir. 2008) ("*Essinger I*"); *Wilson v. State Farm Fire & Cas. Co.*, 761 So. 2d 913, 921 (Miss. Ct. App. 2000); Jeffrey Jackson, *Mississippi Insurance Law & Practice*, §§ 13:2, 13:4 (2010). For the lesser level of extracontractual damages, willful and malicious conduct is replaced with negligence. *See Essinger II*, 534 F.3d at 451; *Universal Life Ins. Co.*, 610 So. 2d at 295.

Previously, Edgewood Manor agreed to dismissal of any claim for bad faith damages. Assuming for argument's sake that Southland did not assign all of its interest in the proceeds *before* any bad faith conduct occurred,[10] its egregious-conduct bad faith claim against RSUI as well as its negligence extracontractual damages claim must be

---

[10]If the insurer did not owe Southland on the contract claim because Southland had fully assigned it to Edgewood Manor, it cannot be liable to Southland for bad faith in not paying the claim. Jackson, *supra*, § 13:2.

dismissed for several reasons. First, RSUI's position regarding coverage was legally arguable. No bad-faith damages arise if the insurer had an arguable basis for refusing to pay the claim or to perform its contractual obligation. Jackson, *supra*, § 13:2. An arguable basis exists if the insurer had a reasonable legal or factual basis for denying the claim or delaying payment. *Essinger I*, 529 F.3d at 271. Moreover, an insurer is not liable for bad faith punitive damages if it denied a claim based on a reasonably debatable undecided question of law; the insurer is entitled to have a court resolve the question of law without being punished. *Dunn v. State Farm Fire & Cas. Co.*, 927 F.2d 869, 873-74 (5th Cir. 1991) (applying Mississippi law).

Here, although the court has found in favor of Southland's and Edgewood Manor's position regarding the assignment of the claim to proceeds, RSUI has advanced an arguable position inasmuch as the assignability of a post-loss but pre-liquidated claim, i.e., a claim to post-loss proceeds that are contingent on satisfaction of a condition precedent, appears to be one of first impression in Mississippi. And while this court has concluded that assignment of such a claim is more akin to an assignment of proceeds than an assignment of a contract, the law is less than clear on the topic.

In addition, the record fails to establish maliciousness or gross conduct by RSUI or reckless disregard of the rights of Southland or Edgewood Manor. This determination relates to the manner in which the claim was denied rather than the reason the claim was denied. Jackson, *supra*, § 13:4. Hence, it must take into account RSUI's letters of repudiation which refer to provisions of the policy and relevant case law. That

one provision of the policy turned out not to apply does not create a question of fact for a jury to decide.

CONCLUSION

For the above-stated reasons,

IT IS ORDERED that plaintiffs' motion for summary judgment (Doc. 11) is denied.

IT IS ORDERED that RSUI's motion for summary judgment (Doc. 38) is granted as to code upgrade amounts and all remaining bad faith or extra-contractual damages but denied as to the claim for repair and replacement costs.

IT IS FURTHER ORDERED that the claim for code upgrade amounts and all bad faith or extra-contractual damages claims, are dismissed.

Finally,

IT IS ORDERED that a scheduling conference is set for March 30, 2011, at 2:30 p.m., in Courtroom 222, to discuss the possibility of mediation and/or dates for a final pretrial conference and trial. At the conference counsel for plaintiffs should be prepared to address the matter discussed in the Order to Show Cause dated June 14, 2010.

Dated at Milwaukee, Wisconsin, this 23rd day of March, 2011.

BY THE COURT

/s/ C. N. Clevert, Jr.
C. N. CLEVERT, JR.
CHIEF U. S. DISTRICT JUDGE